BAKER PILE DRIVING & SITE WORK, L.L.C.
v.
STATE OF LOUISIANA THROUGH THE DEPARTMENT OF WILDLIFE & FISHERIES.
No. 2006 CA 1977.
Court of Appeals of Louisiana, First Circuit.
March 26, 2008.
NOT DESIGNATED FOR PUBLICATION.
J. RONALD WARD, JR., Attorney for Plaintiff  Appellant, Baker Pile Driving & Site Work, L.L.C.
DONALD E. PUCKETT, FREDERICK WHITROCK, Attorneys for Defendant  Appellee State of Louisiana Through the Department of Wildlife & Fisheries.
Before: CARTER, C.J., PETTIGREW and WELCH, JJ.
WELCH, J.
Plaintiff, Baker Pile Driving and Site Work, LLC (Baker) appeals a judgment affirming the denial of its requests for a Scenic Rivers Permit by defendant, State of Louisiana through the Department of Wildlife & Fisheries (DWF). We affirm.

BACKGROUND
In 2001, Baker, through its owner, Robert Baker, leased a vacant, one-acre tract of land adjacent to the Tchefuncte River in Madisonville, Louisiana. The property, located on the north side of Highway 22, consists of 100 feet of river frontage and a private boat slip.
Baker's primary business is the construction of bulkheads along the Tchefuncte River. The company also builds boathouses and lifts, repairs boats, and moves large structures. Baker leased the property in question to serve as a "staging area" to store pilings, wood, and other construction materials. Baker owns two barges, one 99 feet long and 24 feet wide, the other 65 feet long and 22 feet wide, and a tug boat that is approximately 30 feet long. The barges are used to transport pilings, construction materials, and heavy equipment to Baker's marine worksites. Baker stores other equipment on the property until needed, including a cherry picker, backhoe, track hoe, and a wood grinder. Additionally, Baker has two cranes, one with an 80-foot boom and the other with a 35-foot boom. Baker uses the cranes to load the heavy pilings and 55 gallon drums containing water, soap, and nuts and bolts onto the barges.
On March 25, 2002, DWF notified Mr. Baker that his business, located on a segment of the Tchefuncte River that has been designated as a natural and scenic river by the Louisiana legislature, was in violation of the Scenic Rivers Act (sometimes referred to as "the Act"), La. R.S. 56:1840 et seq. because it was engaged in commercial uses, activities and access without a Scenic River Permit. Baker was ordered to submit a Scenic River Permit application to DWF within 15 days.
On April 3, 2002, Baker responded to the notice, asserting that its activities were specifically excluded from the Act because it was engaged in "normal activities" on private property. In its permit application, submitted on April 19, 2002, Baker attested that it uses the property primarily as a staging area for loading wood from shore to barge. Baker submitted that the property has been used for commercial purposes for at least fifty years for the construction of boats by the previous owners, uses that were consistent with other uses in this historically commercial section of the Tchefuncte River. Baker pointed out that landowners adjacent to its property, including Stokes Oil, Nunmaker Yachts, Riverview Marine Services, Inc., and Salty's Marina, were all engaged in commercial activities. Baker asserted that its operation was consistent with the historical and current use of this area of the river, did not detrimentally affect Baker's private canal or the Tchefuncte River, and constituted a "normal use" of the waterways. In a supplemental submission, under the heading "Environmental Assessment," Baker stated that the property was not in use at the time it began its operations, but had been used for commercial purposes in the past. Baker noted that the property accumulated trash and debris from years of non-use and that Baker's removal of this trash and debris improved the aesthetic value of the property.
During the public comment period on the proposed permit application, DWF received over 1,500 letters in opposition to the granting of the permit. The vast majority of these letters were pre-printed form letters, signed by individuals complaining of the industrial nature of Baker's business. The protesters expressed concern that if Baker were granted a permit, it would be difficult to stop future industrial expansion of that portion of the river. Other protestors, who wrote individual letters to DWF, voiced these same concerns, urging that granting a permit to Baker would affect the tranquility, enjoyment and beauty of the river, and would signal the starting point of that area of the river being turned into an industrial canal.
On June 27, 2002, DWF denied Baker's permit application, asserting three reasons in support of its decision. In the first, DWF stated that Baker refused to sign a legal agreement provided in the permit application. In its application, Baker refused to sign a document entitled "Legal Agreement" because it would have to certify that it was engaging in an activity which would otherwise be prohibited by law for which a permit is required. Baker maintained that its business was not in violation of the Act and that no permit was required to continue its operation.
Secondly, DWF concluded that the mooring of barges at this location was inconsistent with the provisions of the Act in that it had a significant impact on the scenic and aesthetic qualities of the Tchefuncte River and was disruptive to the public's normal use and enjoyment of the public waterway. DWF also cited the fact that it received over 1,500 written comments during the public comment period from local citizens, conservation organizations, and businesses requesting that a permit for Baker's activity be denied.
In its third reason for denying the permit, DWF observed that although the area of the Tchefuncte River surrounding the property is developed and used commercially, the significant commercial uses of the river are directed toward recreation and public use. DWF concluded that the mooring of work barges of the size and profile of Baker's barges is not in keeping with the present uses of this segment of the river and would, in fact, represent a departure from present uses. DWF viewed the mooring of work barges as an expansion toward more non-public use and availability of the river, which was not acceptable under the Act.
DWF invited Baker to submit a new application demonstrating how its activities could be modified in a way that might be less intrusive and have less impact to the Tchefuncte River. On January 21, 2003, Baker submitted a second Scenic River Permit application. Therein, Baker agreed not to moor barges on the site on certain holidays and during special events, including the Madisonville Boat Festival, the Madisonville Mardi Gras Boat Parade, Memorial Day weekend, the Fourth of July, and Labor Day weekend. Additionally, Baker submitted six letters from local officials and business owners in support of its application. Madisonville Mayor Peter Gitz expressed his support for Baker's business, noting that the site had been used as a small work yard for over 40 years, as did St. Tammany Parish Councilman Floyd Glass. Geo. W. Stokes Co., Inc., a petroleum products distributor located next door to Baker and a condominium developer, attested that Baker was not a nuisance to the area. Nunmaker Yachts, Inc. added that Baker's business was compatible with the existing businesses in the area. The general manager of the Greater New Orleans Expressway Commission attested that Baker has responded to marine situations threatening the safety of those who commute on the Causeway Bridge, and that Baker's location provided it an appropriate response time to protect the bridge.
On March 25, 2003, DWF denied Baker's second Scenic River Permit application. In so doing, DWF found that the mooring of barges at this location was inconsistent with the purposes behind the Act. It again concluded that such activity had a significant and direct impact on the scenic and aesthetic qualities of the Tchefuncte River and was disruptive to the public's normal use and enjoyment of the public waterway. DWF noted that this appeared to be the general consensus of the public as evidenced by the over 1,500 written comments it received in opposition to the first permit request. DWF also noted that since its denial of the first permit application, Baker continued its operation in violation of the March 25, 2002 compliance order issued by DWF.
Baker appealed the denial of its Scenic River Permit requests to the Division of Administrative Law (DAL). Baker urged that it is exempt from the Act because its use of the private boat slip, where the barges are moored, is "grandfathered in." Baker also urged that the Act's exemption for normal activities of a private landowner applied to its activities. Additionally, Baker submitted that DWF's decision to deny its permit applications was not supported by a preponderance of the evidence, and that the Act is unconstitutionally vague.
At the hearing before an Administrative Law Judge (All), witnesses testified and documentary evidence was introduced. Thereafter, the All affirmed DWF's denial of the permit applications. The ALJ found that the evidence showed that the property had not been in use for years, and the years of non-use interrupted the vesting of Baker's grandfathering. The ALJ also concluded the privately-owned property exemption relied on by Baker was not applicable. Next, the ALJ concluded that the denial of Baker's permits by DWF was supported by the evidence and was not arbitrary and capricious. The ALJ further found that the DAL had no authority to determine whether the Act was unconstitutional.
Baker appealed the DAL's ruling to the 19th Judicial District Court. The trial court found no error in the ALJ's determinations, and further found that the Act is not unconstitutionally vague.
In this appeal, Baker contends that the trial court erred: (1) by failing to recognize Baker's vested right to use the property without a Scenic River Permit; (2) in applying the wrong standard of review; (3) in upholding the agency's denial of its permit applications; and (4) in refusing to declare the Act unconstitutionally vague and a violation of due process.

STANDARD OF REVIEW
A person aggrieved by a final decision or order in an adjudicative proceeding is entitled to judicial review in accordance with the provisions of the Louisiana Administrative Procedure Act. When reviewing an administrative final decision, a trial court functions as an appellate court. Doe's Clinic, APMC v. State ex rel. Department of Health and Hospitals, XXXX-XXXX, p. 8 (La. App. 1st Cir. 11/2/07), ___ So.2d ___, ___, writ denied, 2007-2302 (La. 2/15/08), ___ So.2d ___ . Once a final judgment is rendered by a district court, an aggrieved party may seek review by appeal to the appropriate appellate court. La. R.S. 49:965.
An appellate court sitting in review of an agency decision reviews the findings and decisions of the administrative agency, not the decision of the trial court. King v. Secretary, Louisiana Department of Health and Hospitals, 42,071, p. 8 (La. App. 2nd Cir. 4/4/07), 956 So.2d 666, 670, writ denied, XXXX-XXXX (La. 9/14/07), 963 So.2d 1001, cert. denied, ___ S.Ct. ___ (U.S. 2008). Thus, on review of the district's court judgment, no deference is owed by the court of appeal to the factual findings or conclusions of the trial court, just as no deference is owed by the Louisiana Supreme Court to factual findings or legal conclusions of the court of appeal. Doe's Clinic, Supra. Consequently, this court will conduct its own independent review of the record and apply the standards of review provided for by La. R.S. 49:964(G).
Pursuant to La. R.S. 49:964, a reviewing court is confined to the record established before the agency. A reviewing court has the authority to reverse or modify the decision of the administrative agency on judicial review only if the substantial rights of the party seeking review have been prejudiced because the administrative findings, inferences, conclusions or decisions are: (1) in violation of constitutional or statutory authority; (2) in excess of the agency's statutory authority; (3) made upon unlawful procedures; (4) affected by other error of law; (5) arbitrary or capricious or characterized by an abuse of discretion or clearly unwarranted exercise of discretion; or (6) not supported and sustained by a preponderance of the evidence. Louisiana Revised Statutes 49:964(G)(6) makes it clear that in applying the preponderance of the evidence standard, a reviewing court shall make its own determination and conclusions of fact by a preponderance of the evidence based upon its own evaluation of the record in its entirety. It further states that where an agency has the opportunity to judge the credibility of witnesses by first-hand observation and the reviewing court does not, due regard shall be given to the agency's determination of credibility issues.

APPLICABILITY OF THE SCENIC RIVERS ACT
The Scenic Rivers Act was enacted by the Louisiana legislature in 1970. La. Acts 1970, No. 398 Sec. 1. Thereafter, in 1988, it was reenacted and amended, and its provisions are currently found in La. R.S. 56:1840 through 1856. Over time, various bodies of water have been designated as scenic rivers and streams subject to the provisions of the Act. In 1985, by virtue of La. Acts 237, the segment of the Tchefuncte River, on which Baker's property lies, was designated as a natural and scenic river subject to the provisions of the Act. Pursuant to La. R.S. 56:1849(A), no person shall commence or engage in any activity governed by the Act or any rule pursuant thereto unless a permit is first obtained from DWF.
The purpose of the Act, set forth in La. R.S. 56:1841, is as follows:
A. The Legislature of Louisiana hereby finds that there exist in Louisiana many unique and diverse free-flowing rivers, streams, and bayous which should be preserved, protected, and enhanced for the present and future benefit of Louisiana citizens. In order to assist in fulfilling its duties to protect, conserve, and replenish the natural resources of this state in accordance with Louisiana Constitution Article IX, Section 1, the legislature does hereby establish the Louisiana Natural and Scenic Rivers System.
B. (1) This system shall be administered for the purposes of preserving, protecting, developing, reclaiming, and enhancing the wilderness qualities, scenic beauties, and ecological regime of certain free-flowing streams or segments thereof.
(2) This system shall further be administered for the purpose of preserving aesthetic, scenic, recreational, fish, wildlife, ecological, archaeological, geological, botanical, and other natural and physical features and resources found along these streams or segments thereof.
The Act makes the DWF secretary the administrator of the system, who is given authority, in accordance with the policies and purposes of the Act, to adopt rules, regulations, and criteria necessary to implement the Act, as well as the power to grant or deny permits. La. R.S. 56:1843(B)(1) and (3).
In accordance with the Act, in 1988, DWF promulgated guidelines and procedures for the administration of natural and scenic rivers. These regulations are contained in Title 76, Part IX, Chapter 1, Sections 101 through 127 of the Louisiana Administrative Code. Pursuant to Section 105, the regulations extend to "all uses proposed to be undertaken on the stream or on adjacent lands within 100 feet of a designated system stream by any 'person" unless the use is exempted from regulations pursuant to La. R.S. 56:1852(B).
Section 117, entitled "Permitted Activities" provides as follows:
A. All activities that may detrimentally affect or significantly degrade the wilderness quality, aesthetic values, or the ecological integrity of a system river shall be subject to a permit except:
(1) those prohibited uses set forth in § 115 of these regulations;
(2) normal activities of private landowners within the boundaries of their property as provided by R.S. 56:1852(B); and
(3) harvesting of trees in accordance with R.S. 56:1854, provided that prior notification of any commercial harvesting of trees shall be given to the Louisiana Office of Forestry.
Paragraph B of Section 117 sets forth activities requiring permits. Included therein, among numerous other activities are: piers, boat slips, bulkheads, and landings, as well as commercial uses, activities and access. LAC 76:IX.117(B) (6) and (7).
In its first assignment of error, Baker contends that the trial court erred in failing to recognize that it has a vested right to use its property without a Scenic River Permit. Baker claims that the evidence established that the property had been used commercially for over 50 years. In support of its vesting argument, Baker relies on La. C.C. art. 6, which contains a general proscription against the retroactive application of substantive laws. Baker submits that DWF should have considered its commercial use to be "grandfathered in" under the Act and thus exempt from the Act's permitting requirement.
In the DAL proceedings, Baker introduced a December 21, 2001 letter from the State Land Office to Mr. Harry Wood, Baker's neighbor, and a letter written by Mr. George C. Mire, whose family previously owned the subject property. These documents show that the Mire family dredged a portion of their property to create a boat and barge slip adjacent to the river, which was used for unloading shell barges. Baker also introduced the affidavit of Phillip Ditta, who leased the property from 1970 through 1980 and who attested that he continuously used the land and adjoining boat slip to store construction material and build large tugboats. Mr. Ditta stated that he purchased the property in 1980, and from that time until leasing the property to Baker in 2001, he continued to use the land and boat slip for his boat building business.
As a general rule, a law may not be applied retroactively if it would disturb vested rights. Adams v. City of Baton Rouge, 95-2515, p. 17 (La. App. 1st Cir. 4/30/96), 673 So.2d 624, 632 n.10, writs denied, 96-1491, 96-1492 (La. 9/20/96), 679 So.2d 439. A right is vested when the right to enjoyment, present or prospective, has become the property of some particular person or persons of interest. This right must be absolute, complete, and unconditional. Id.
In rejecting Baker's grandfather clause argument, the lower tribunals found that Baker failed to demonstrate that there had been a continuous, open, and consistent use of the property to commercially load and unload barges before and after this portion of the river was included in the scenic rivers system. The ALI noted that while Mr. Ditta attested that he used the property for storage and the commercial construction of boats up until the time it was leased to Baker, in the permit application, Baker's owner attested that the property was not in use at the time Baker began its operations in 2001, and that trash and debris had accumulated on the property from years of non-use. The ALT believed Mr. Baker's contrary statement on the use of the property was more credible than Mr. Ditta's affidavit. The trial court concluded that there was sufficient evidence to support the ALJ's determination that there had not been an open and consistent use of the property to commercially load and unload barges prior to the implementation of the Act.
The record contains the testimony of Lieutenant Bradley Cromp, a DWF enforcement agent who works along the Tchefuncte River. Lieutenant Cromp testified that he patrolled the Tchefuncte River for 25 years and was familiar with the Baker site, as he parked his boat nearby and walked across the property to get to a nearby convenience store. Lieutenant Cramp testified that before Baker began operating, he had seen boats tied up to the property that were being worked on, but could not recall any barges being pulled up the property.
The determination of whether the activity engaged in by Baker was continuing and on-going before and after this section of the Tchefuncte River was added to the Act is a question of fact, review of which is governed by La. R.S 49:964(G)(6). After examining the entire record, we find that Baker simply failed to demonstrate that the property had been used to commercially load and unload barges for a sufficient period of time before and after the Act so as to create a vested right on Baker's part to engage in that use without a permit. Therefore, Baker's grandfather clause argument must necessarily fail.
In its third assignment of error, Baker submits that its activities are exempt under the Act and under DWF regulations. It relies on La. R.S. 56:1852(B), which creates an exception for normal activities of landowners within the boundaries of their own property. Louisiana Revised Statutes 56:1852(B) states:
A. Recognizing that some few of the streams recommended for inclusion as natural and scenic rivers may not be state owned but owned by adjacent landowners, the state legislature encourages riparian owners to grant to the system administrator scenic servitudes and surface servitudes.
B. Except as provided in R.S. 56:1853 and R.S. 56:1854, no provision of this Part shall restrict the normal activities of landowners within the boundaries of their own property unless a mutual agreement has been entered into with the system administrator.
C. Any interested party, upon written request to the administrator, shall be provided copies of rules then in effect or thereafter adopted by the administrator pursuant to the provisions of this Part.
Louisiana Administrative Code Title 76.IX.117(A)(2) also contains an exemption to the permitting requirements for "normal activities of private landowners within the boundaries of their property as provided by R.S. 56:1852(B)." The regulations define "normal activities" as "those activities on lands that do not directly and significantly degrade the ecological integrity of a natural and scenic river." LAC 76.IX.103.
Baker submits that all of its activities occur on private property, and there has never been a determination by DWF that Baker's activities degrade the ecological integrity of the Tchefuncte River. Therefore, Baker posits, its activities are subject to the private property exception provided for in La. R.S. 56:1852(B) and the DWF's regulations.
In rejecting this claim, the All found that the private property exemption did not apply to Baker, concluding that in order for Paragraph B of La. R.S. 56:1852 to come into play, the waterway adjacent to Baker's property would have to be privately owned as provided for in Paragraph A of La. R.S. 56:1852. The trial court disagreed with this interpretation, finding that the exemption provided for in Paragraph B was independent of the other provisions in La. R.S. 56:1852. However, the court found there was evidence from which it could be determined that part of the necessary use of the property to carry out Baker's activities involved extending out into the waterway, and therefore, the private property exemption did not apply.
The evidence shows that Baker's property measures 100 feet along the river and consists of a privately owned water bottom that had been dredged from the property for use as a boat slip. A 100-foot bulkhead extends across the front of Baker's property. The water portion of the slip is between 40 and 100 feet extending from the bulkhead. Clay Carter, an employee with the State Land Office, testified that he investigated the claim of Baker's neighbor, Harry Wood, who was interested in obtaining a water bottoms lease for the Tchefuncte River in front of his property. Mr. Carter attested the Land Office determined at that time that the boat slip on Baker's property was not part of the river but was privately owned.
The evidence established that Baker owns a barge that is 99 feet long and 24 feet wide, another barge that is 65 feet long and 22 feet wide, and a tugboat that is 30 feet long. Mr. Baker admitted that although he docks his barge 90% of the time broadside so that it is along the bulkhead, on occasion he will "nose" the barge in. Lieutenant Cromp testified that he was familiar with Baker's activity and use of the barges at the site. He attested that he had seen the barge docked parallel with the river bank, and sometimes had seen it docked perpendicular to the bank. He stated that the barge had been docked perpendicular more so when Baker was loading material onto and off of the barge.
Considering the entire record, we find Baker has not proven its claim that all of its activities occur within the confines of its private property. Accordingly, we do not find Baker's activities fall under the exemption found in the Act and DWF regulations for the normal activities of landowners within the boundaries of their properties.
Next, Baker attacks the merits of the trial court's decision to uphold the permit denial. First, Baker contends that the trial court erred by not making its own determination of the validity of the agency's action and by instead focusing on whether the ALJ's decision was supported by the evidence. A review of the trial court's oral reasons indicates that the court did apply the standards of review set forth in La. R.S. 49:964(G). Even if the court had not done so, this court reviews the decision of the agency, not the trial court, and conducts an independent review of the evidence applying the standards of review set forth set forth in La. R.S. 49:964(G). Employing that standard of review, we shall determine whether there is a basis for overturning the agency's decision under the provisions of La. R.S. 49:964(G).
Louisiana Revised Statutes 56:1849 sets forth the criteria DWF must consider in evaluating a permit application. Paragraph C of that provision states:
The criteria for an evaluation of an application for a permit shall consider the impact the activity may have on the characteristics and qualities of the natural and scenic river, including but not limited to the following:
(1) Wilderness qualities
(2) Scenic values
(3) Ecological regimes
(4) Recreation
(5) Fish and other aquatic life
(6) Wildlife
(7) Historical and archaeological
(8) Geological
(9) Botanical
(10) Water quality as determined by the Department of Environmental Quality
(11) Cultural
(12) Economics
DWF's regulations set forth additional guidelines for evaluating a permit application. Louisiana Administrative Code Title 76.IX.117(F) provides that in determining whether to issue a permit, DWF's evaluation must consider the purposes for which the river system is established, and must make its decisions with a view toward maintaining the fundamental character and unique values associated with the river in question. It further provides that any evaluation "shall fully and thoroughly consider, but not be limited to, the following criteria:"
1. wildness qualities;
2. scenic values;
3. ecological regimes
4. recreation
5. aesthetic values
6. fish and other aquatic lift;
7. wildlife;
8. historical and archaeological resources;
9. geographical resources;
10. botanical resources;
11. water quality;
12. cultural resources;
13. economics;
14. compliance history as required in § 117.C.11;
15. any reasonable alternatives to the proposed use; and
16. a. whether reasonable steps have been taken by the applicant to minimize and/or offset any detrimental effects on natural and physical features and resources.
David Keith Cascio, the scenic rivers coordinator for DWF, and his supervisor, Blue Watson, evaluated both of Baker's permit applications according to the criteria listed above. In his evaluation, Mr. Watson concluded that Baker's operation would have no effect on wilderness quality, would not constitute a significant negative impact on the scenic value or recreational value of the stream at that location, and would not substantially degrade the aesthetics of the area. However, Mr. Cascio's evaluation found that Baker's operations would have a negative impact on the scenic qualities of the area, would diminish the quality of the area as a recreational area, and would represent a significant aesthetic impact. Mr. Cascio noted that where subjective judgments are necessary, such as in determining the scenic and aesthetic impact of a proposed project, it was extremely important to consider the opinions of the public, particularly those persons who live on or around the proposed project. He noted that in this case, over 1000 local citizens expressed their opposition to Baker's permit application because of its negative impact on the scenic and aesthetic qualities, and stressed that it was imperative that DWF consider those views. Additionally, Mr. Cascio opined that Baker's large scale construction operation in a predominately recreational/residential area represented a significant aesthetic impact.
In denying Baker's two permit applications, DWF made the following findings:
The mooring of barges at this location is inconsistent with the provisions of RS 56:1841B(1) and (2) wherein the Legislature mandated the purposes for which the Scenic River system shall be administered. The mooring of barges at this location has a significant and direct impact on the scenic and aesthetic qualities of the Tchefuncte River and is disruptive to the public's normal use and enjoyment of this public waterway. This also appears to be the general consensus of the public as evidenced by over 1500 written comments received during the public comment period from local citizens, conservation organizations and businesses, all of whom have requested that permit for this activity be denied.
Though this area of the Tchefuncte River is developed and used commercially, all of the significant commercial uses of the River in the vicinity of this project are directed toward recreation and public use. The mooring of work barges of this size and profile is not in keeping with the present uses of this segment of the Tchefuncte River and, in fact, would represent a departure from present uses. We therefore view the mooring of work barges such as these as an expansion toward more non-public use and availability of this important public resource which is not acceptable under the Scenic Rivers Act.
Additionally, DWF noted that after the first permit denial, on September 9, 2002, DWF personnel witnessed Baker's continued operation of its business. DWF stressed that this activity occurred over six months after it notified Baker that its continued operations without a permit violated the Act.
At the hearing, Mr. Cascio testified that the Baker property is located in a recreationally commercial area, with the predominant features being a yacht club, marinas, condominium developments, and a state park. He explained that the use to which Baker sought to put the property was intended for the area along the Tchefuncte River above the Highway 22 bridge where industrial type activities are conducted.
Baker contends that DWF's denials of its applications were procedurally flawed and violated DWF's obligation under the statute to analyze each of the required criteria set forth therein. We find no merit to this assertion. DWF evaluated all of the applicable criteria set forth in the statute and its own regulations. Additionally, we find it unnecessary to address Baker's argument that DWF exceeded its authority by adopting a "100-foot rule" to authorize DWF to regulate activities within 100 feet of a scenic river. LAC 76:IX.105. As we have found that Baker failed to demonstrate its activity did not extend into the Tchefuncte River, this rule simply has no bearing on the merits of DWF's permitting decision.
Next, Baker maintains that DWF's decisions to deny its permit applications were not supported by a preponderance of the evidence and were arbitrary and capricious. It maintains that the evidence showed that barge traffic is common on the Tchefuncte River. Baker also insists that DWF acted arbitrarily and capriciously in denying its permit applications by ignoring the historical and current use of barges along the Tchefuncte River, and by giving weight to letters opposing its first application, while according no weight to the lack of opposition and letters in support of the second application.
However, after reviewing the entire record, we cannot say that the agency's permit decisions were arbitrary and capricious, and we find that those decisions were supported by a preponderance of the evidence. Although Baker complains that DWF ignored barge traffic in the area, it is clear that DWF's permit decision was not based on Baker's actions in traversing the Tchefuncte River with barges. Rather, DWF's permit denial was based on Baker's commercial activities relating to the mooring of his barges to the adjacent property. Moreover, we do not find that the agency acted arbitrarily and capriciously in its handling of public comments made in reference to Baker's permit application.
Lastly, Baker submits that the Act is unconstitutionally vague and violative of its due process rights. Specifically, Baker complains that while the Act uses the terms "scenic" and "aesthetic," the Act fails to define those terms and contains no objective formula therein to guide the agency in determining what is scenic or aesthetic. In order to apply these criteria, Baker argues, DWF must engage in highly subjective determinations. Baker posits that not only are the terms vague because they are subjective, they are susceptible to significant disagreement between persons of common intelligence. Therefore, Baker urges, because the terms "scenic" and "aesthetic" were used by DWF to deny its permit applications, and because those terms render the Scenic Rivers Act unconstitutional, DWF's permitting decisions must be reversed.
We disagree. A statute is presumed to be valid and its constitutionality should be upheld whenever possible. State v. Turner, 2005-2425, p. 4 (La. 7/10/06), 936 So.2d 89, 94, cert. denied, 127 S.Ct. 1841, 167 L.Ed.2d 337 (2007). A law is fatally vague and offends due process when a person of ordinary intelligence does not have a reasonable opportunity to know what is prohibited so that he may act accordingly or if the law does not provide a standard to prevent arbitrary and discriminatory application. Med Express Ambulance Service, Inc. v. Evangeline Parish Policy Jury, 96-0543, p. 11 (La. 11/25/96), 684 So.3d 359, 367, (citing Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 497-499, 102 S.Ct. 1186, 1193, 71 L.Ed.2d. 362 (1982)). However, the fact that a statute's terms are subjective and susceptible to interpretation does not render it vague. State v. Boyd, 97-0579, p. 3 (La. 4/14/98), 710 So.2d 1074, 1076.
The Act and DWF's regulations clearly set forth what type of conduct is subject to the permitting requirements contained therein. The terms "scenic" and "aesthetic" are commonly understood terms, and the mere fact that there is no formula set forth in the Act for determining what uses impact the scenic and aesthetic qualities of a scenic river does not render the Act unconstitutionally vague. Accordingly, we find no merit to Baker's constitutional challenge.

CONCLUSION
For the foregoing reasons, the judgment appealed from is affirmed. All costs of this appeal are assessed to appellant, Baker Pile Driving and Site Work, LLC.
AFFIRMED.